UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MYRA WOODS

            Plaintiff,                  Case No. 06-11039

vs.                            DISTRICT JUDGE BERNARD A. FRIEDMAN
                                  MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

            Defendant.
_____/

**REPORT AND RECOMMENDATION**

## I.    BACKGROUND

Myra Woods brought this action under 42 U.S.C. §405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and the Commissioner's motion for summary judgement GRANTED.

### A.    Procedural History

Plaintiff applied for DIB in April 2002 (R. 51-53), alleging that she became disabled February 9, 2001, as a result of anxiety, anemia, irritable bowel syndrome, internal bleeding and pain, ulcer, diarrhea, and constipation (R. 76).  After Plaintiff's claim was initially denied (R. 38-42), a hearing was held on August 16, 2004, before Administrative Law Judge Bennett S. Engelman (ALJ) (R. 311-324).  Plaintiff was represented by her current attorney, Mikel

Lupisella and Vocational Expert Timothy Shaner (VE) also testified (R. 319-322).

In an October 1, 2004, decision ALJ Engelman concluded that Plaintiff was not under a disability as defined by the Act because she could perform a range of light work that included a significant number of jobs (R. 16-29). On January 31, 2005, the Appeals Council denied Plaintiff's request for review (R. 5-7).

**B.    Background Facts**

**1.    *Plaintiff's Hearing Testimony***

Plaintiff was 43 years old, and living with her 13 year old daughter at the time of the hearing (R. 312, 316). She completed high school and had no other schooling or vocational training (R. 312). Plaintiff had been supported, in part, by $2,200 in monthly extended disability benefits from her former employer. She filed a worker's compensation claim, which was pending at the time of the ALJ's decision (R. 313-314).

Her last full time employment was with General Motors as a machine operator, a position she held from December 1991 until February 2003 (R. 77, 313).[1] Plaintiff was allowed to sit or stand at her discretion and take breaks as necessary. ALJ Engelman questioned Plaintiff as to "what the worst problem is that prevents [her] from working" and she responded that she has "a lot of different problems," but specifically she has pain in her hands, stomach, shoulder, and neck, has difficulty controlling her bowels, and that "sometimes [she] can't remember stuff" (R. 314). Plaintiff underwent surgery for carpel tunnel in April and November of 2003, but still experienced pain and had been instructed by her doctor to wear splints both at night and during

---

[1] Plaintiff indicated in her disability report that she worked as an assembler until February 2001 (R. 77). Yet, at the hearing she testified that she worked as an assembler until February 2003, after which time she did not work (R. 313).

the day (R. 315).

Plaintiff testified that her lifting is limited to about a half gallon and that she had to utilize both hands when lifting such an item.  She also had problems pushing, pulling, reaching overhead, holding onto objects and opening lids on jars (R. 317).  On her symptom questionnaire, Plaintiff indicated that her pain is mostly constant and that there is not a certain activity that causes the pain (R. 89).

Plaintiff reported that the medications, which she took on a daily basis, made her drowsy, sometimes nauseated, gave her headaches and caused her to lie down (R. 316).  In addition, Plaintiff indicated on her symptom questionnaire she experienced medication side effects of "nausea, stomach cramps, headaches" (R. 90).  She sometimes woke in the night due to cramping and had to take her medication  (R. 317).

Plaintiff did not belong to any groups, organizations or clubs and reported difficulty being around people (R. 316-317).  She testified that her children did the grocery shopping and assisted her with the housework.  A friend cuts her grass and helped with other maintenance.  On her daily activities questionnaire, Plaintiff reported routinely caring for her personal needs, preparing meals, shopping for groceries, performing household chores and occasionally driving her car to run errands (R. 85-88).  She spends the majority of her time watching television, reading and visiting her daughter.

### 2.    *Medical Evidence*

On March 12, 2001, Jyothi.Nutakki, M.D., performed a psychiatric examination of Plaintiff (R. 167).  Plaintiff denied active suicidal or homicidal ideas, obsessions, or compulsions, and there was no evidence of panic or hypomanic symptoms.  Dr. Nutakki

3

diagnosed her with Major Depressive Disorder and Dysthymia and gave her a Global

Assessment of Functioning (GAF) score of 50 (R. 169-170).[2]  He started Plaintiff on medication,

including Ativan and Serzone.  On April 2, 2001, Plaintiff stated she could tolerate the Serzone

and her dosage was increased accordingly.  Plaintiff again denied suicidal or homicidal ideation

(R. 166).

On April 30, 2001, Plaintiff stated she was "doing a lot better," but forgot to take her

medication regularly (R. 165).  Similarly, on August 1, 2001, Plaintiff told Dr. Nutakki she had

been forgetting to take Serzone (R. 164).  Plaintiff had poor attention, concentration, and

psychomotor retardation, and was given Prozac.

On August 3, 2001, Plaintiff was seen by social worker Michele Gustafson, A.C.S.W.,

D.C.S.W.  Plaintiff presented to the office "tired" and indicated she was "not sleeping well."

Interventions were primarily cognitive and supportive (R. 163).

On September 5, 2001, Dr. Nutakki noted Plaintiff "looks very down," but denied

suicidal or homicidal ideations (R. 162).  Her affect was almost flat and she spoke slowly

without any "reactivity." Similarly, on October 30, 2001, Ms. Gustafson saw Plaintiff and

---

[2] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.  A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.*  A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  *Id.*   A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

4

described her as "low energy but less sullen" (R. 161).

On November 14, 2001, Plaintiff was seen by gastroenterologist, John M. Macksood, D.O. Dr. Macksood reported that Plaintiff "has other chronic symptoms which are consistent with irritable bowel syndrome in the form of alternating constipation and diarrhea," that Plaintiff "has a lot of symptoms of depression along with this including fatigue and not even wanting to get out of bed," and that "this may be just be increased symptomatology due to increased stress from her divorce at this time" (R. 149). A colonoscopy was preformed with normal findings. In addition to taking Nexium, Plaintiff was started on liquid Zantac at night.

On February 28, 2002, Plaintiff told Dr. Nutakki she was "doing fairly well," except for problems with her gastric ulcer (R. 160). With depression, Plaintiff was doing well with Prozac and Serzone and denied suicidal or homicidal ideations, and anxiety. Plaintiff appeared "somewhat psychomotorically retarded," and was asked to exercise and see her therapist to learn some behavioral methods to control her depression.

On August 7, 2002, Gordon R. Forrer, M.D., performed a psychiatric examination of Plaintiff, at the request of the state agency (R. 171). Plaintiff reported getting along well with her family. She drove, took care of the usual household chores including cooking and laundry, and occasionally did outside work (R. 172). Plaintiff read and had no concentration problems. She showed no signs of anxiety, her mood was mild sadness, she was pleasant, cooperative and agreeable, and she was not suspicious (R. 173). She had no hallucinations, except for haptic hallucinations, she was not paranoid, her affect was blunted but appropriate to thought content, she had no suicidal thoughts, and she was oriented (R. 172-73). Plaintiff appeared to be of average intellect and her memory was intact (R. 173-74). Dr. Forrer concluded that Plaintiff

could work forty hours a week with adequate pacing and concentration, at a job that was simple, routine and repetitive, and, in fact, she could work at a job at a higher level (R. 174).

On December 17, 2002, Jeffery R. Levin, M.D., saw Plaintiff for a neurologic evaluation (R. 199). Plaintiff complained of neck, hand, elbow pain, and hand tingling when she awakened. There was some weakness in the right shoulder and at the base of the palm at the thumb on both hands. There was no weakness in the lower extremities, and Plaintiff could heel to toe and tandem walk without difficulty. There were no reflex or sensory deficits. Plaintiff also underwent MRI of the cervical spine that showed mild spondyloarthritic changes at C5-6 (R. 201).

On February 6, 2003, Plaintiff underwent EMG studies of the upper extremities (R. 196). The results showed bilateral carpal tunnel syndrome and C5 radiculopathy on the right (R. 196-98). On July 8, 2003, Dr. Levin reviewed the EMG and MRI films and confirmed they, along with his clinical findings, supported a diagnosis of carpal tunnel syndrome and cervical radiculopathy (R. 194).

From January 2003 to March 2004 Plaintiff saw Dr. Nutakki on several occasions (R. 215, 222-24, 229). Throughout treatment, Plaintiff denied suicidal or homicidal ideations, and anxiety (R. 215, 222-24, 229). In May and December 2003, Plaintiff was depressed (R. 222-23). In January 2003, Plaintiff told Dr. Nutakki she had been doing well on the current dosage of medication (R. 224). In July 2003, Plaintiff stated that overall she was doing fairly well (R. 223). In October 2003, Plaintiff stated that since she decided not to go back to work and apply for permanent disability, a lot of stress was gone, and she also stated she was doing well (R. 223). In January 2004, Dr. Nutakki noted Plaintiff was smiling and was very appropriate, and

Plaintiff stated she was doing much better in the last week (R. 215).  In March 2004, Plaintiff indicated that she was doing better (R. 229).

On November 20, 2003, Plaintiff underwent right carpal tunnel release (R. 192).  There were no complications.

On December 11, 2003, Plaintiff saw Ms. Gustafson, her social worker (R. 217). Plaintiff stated she started to walk in the summer, but was not doing anything at the time of the appointment.  Plaintiff's attention was fair, her affect was constricted, her mood was depressed, and her thought process was intact (R. 219).  Plaintiff had no hallucinations, delusion, or suicidal of homicidal ideations.  She reported problems with short-term memory, her judgment was impaired, and she was fully oriented (R. 219-20).  Plaintiff stated she had concentration problems, but there was no evidence of a thought disorder (R. 220).  Plaintiff was diagnosed with Major Depression recurrent, moderate, with underlying Dysthymia and given a GAF score of 52 (R. 221).  Ms. Gustafson provided discharge criteria of significant improvement in symptoms of depression, statements of general satisfaction with daily living, and stabilization at an improved level.

Plaintiff also saw Dr. Nutakki on December 11, 2003, for an emergency visit (R. 222). She was very depressed, overwhelmed, and confused.  Plaintiff was offered and refused to go to an intensive outpatient program.  She denied any suicidal or homicidal ideas.

On January 29, 2004, Plaintiff saw Ms. Gustafson who described Plaintiff as "looking a little better, well-groomed, lighter colors, face a little brighter."  Yet, Plaintiff continued "to be sullen, glum and non-spontaneous" (R. 214).  On March 22, 2004, Ms. Gustafson again diagnosed Plaintiff with Major Depression, recurrent, moderate, with underlying Dysthymia and

gave her a GAF score of 56 (R. 227).  Ms. Gustafson provided discharge criteria of "significant improvement in symptoms of depression and anxiety, report of overall satisfaction in daily living, and stabilization at an improved level for at least two months."

On December 15, 2003, Dr. Levin conducted an examination of Plaintiff that showed some cervical paraspinal muscle spasm, weakness in the right shoulder, and some weakness at the base of the palm at the thumb on both hands (R. 193).  Dr. Levin stated that Plaintiff will continue to stay off work and that at the time of her examination could not return to the same work she was doing before.

Medical Evidence Submitted After the October 2004 decision to the Appeals Council[3]

Plaintiff submitted a December 2, 2003, report that stated after her November 20, 2003 carpal tunnel release, Plaintiff's wound was healing well and her numbness was completely resolved (R. 234).[4]  The pilar pain was increasing and the contralateral side was giving her increased difficulties.  The Tinel's and Phalen's sign remained positive.

On February 24, 2004, Plaintiff underwent EMG studies of the upper extremities and the

---

[3] Because this evidence was not before the ALJ when he rendered the final decision of the Commissioner, it cannot be considered for substantial evidence review. *See Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). The only purpose for which this Court can consider this additional evidence is to determine whether this case should be remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v. Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993). This court may remand the case if the additional evidence is new and material, and if there was good cause for failure to incorporate the additional evidence into the record at a prior hearing. 42 U.S.C. § 405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v Secretary of Health and Human Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

[4] Some of the evidence Plaintiff submitted to the Appeals Council duplicates evidence in the record that was presented to the ALJ.  This section only contains information that was presented solely to the Appeals Council.

results showed carpal tunnel syndrome right greater than left, cubital tunnel syndrome on the right, and C5 radiculopathy (R. 237). On April 13, 2004, Plaintiff underwent left carpal tunnel release (R. 235-36). On May 17, 2004, Thomas H. Beird, M.D., noted that Plaintiff's incision was healing nicely (R. 233). On August 9, 2004, Dr. Beird found Plaintiff had no further numbness in either hand in the median distribution, although she complained of numbness in the ulnar distribution bilaterally. He opined plaintiff "most likely" had "mild" cubital tunnel syndrome, but that condition would presently not require surgery.

On August 3, 2004, Ms. Gustafson diagnosed Plaintiff with Major Depression, recurrent, moderate, with underlying Dysthymia and gave her a GAF score of 50-55 (R. 275). She opined that Plaintiff's general progress to date was "poor" and that her symptoms are "stable, but not improved" (R. 274). Similarly, on November 23, 2004, Plaintiff was given the same diagnosis (R. 269). Plaintiff had made "no noticeable change since the last reassessment. The downward trend seems to have halted, however." (R. 268).

On August 11, 2004, Plaintiff saw Dr. Nutakki, after he contacted Plaintiff to come in to his office (R. 276). Plaintiff had no suicidal ideation, she seemed depressed, and she had a flat affect. Similarly, on November 18, 2004, Dr. Nutakki found plaintiff had no suicidal of homicidal ideations, but presented with "serious psychomotor retardation" (R. 270).

### 3. *Vocational Evidence*

Timothy Shaner served as the vocational expert (the "VE") in this matter (R. 319). VE Shaner classified Plaintiff's past work as a machine operator as sedentary and unskilled. He indicated that as the job is normally performed it would require repetitive use of the hands.

ALJ Engelman asked VE Shaner to consider an individual of the same age, education,

and work experience as the Plaintiff who was limited to light, relatively simple work with non-repetitive use of the hands and limited public contact. VE Shaner testified that this hypothetical person could perform jobs at both the sedentary and light exertional levels and offered the following light unskilled jobs: laundry worker (6,100), meter reader (1,500), inspector (8,000) and security guard (5,000).   Laundry works use their hands frequently, but not to the degree the Dictionary of Occupational Titles ("DOT") would consider constantly (R. 320).   A security guard would typically have limited contact with the public as opposed to no contact.   Meter readers are sometimes considered semi-skilled depending on the specific duties of their job. While some meter readers are able to scan meters, other readers have to manually punch in the numbers.

Changing the hypothetical, ALJ Engelman asked VE Shaner to consider a hypothetical person that suffered from "a combination of pain, abdominal upset, or depression, which results in crying spells which we observed today, somebody would be away from the job more than two hours in an eight-hour day or twenty-five percent" (R. 321).   VE Shaner testified that such a person would not be competitively employable, adding that an unskilled worker missing more than a combination of one day per month eventually leads to termination.

In response to questions from Plaintiff's attorney, VE Shaner further classified his identified positions according to hand use and public contact.   While a laundry worker would require frequent use of her hands, an inspector would use her hands somewhere between occasionally and frequently, and a security guard would use her hands the least (R. 322).   A meter reader may have to use her hands to carry her input device, but a belt could also be utilized while going between meters.   VE Shaner indicated that a meter reader would need to use her

10

hands occasionally to punch in readings.  Laundry workers, inspectors and meter readers have very infrequent contact with the public.  A security guard has occasional contact.

### 4.   *The ALJ's Decision*

ALJ Engelman found that Plaintiff met the disability insured requirements of the Act through the date of the decision (R. 28).

Plaintiff's major depression and history of carpal tunnel surgery qualified as severe impairments.  The severity of the Plaintiff's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing").

ALJ Engelman found that Plaintiff's allegations regarding her limitations were not fully credible because the degree of pain and limitation alleged was not consistent with the objective medical evidence, including the testimony at the hearing (R. 25).  He noted that Plaintiff has not required long-term hospitalization for any physical or mental difficulties and no further surgical intervention or other aggressive treatments have been prescribed.  Plaintiff obtains satisfactory results from medication, when taken as instructed, and does not suffer any side effects that would reasonably prevent her from completing an eight-hour workday.  In addition, ALJ Engelman found that Plaintiff did not identify any specific limitations in her ability to walk, stand, sit or carry (R. 24).

With respect to activities of daily living, ALJ Engelman noted that Plaintiff reported routinely caring for her personal needs, preparing meals, shopping for groceries, performing household chores and occasionally driving her car to run errands.  She spends the majority of her

time watching television, reading and visiting her daughter.  Further, ALJ Engelman concluded

that Plaintiff was "influenced against seeking employment" because of the presence of secondary

gain in the form of substantial long-term disability benefits provided by her former employer (R.

25).

ALJ Engelman evaluated Plaintiff's mental impairments in accordance with 20 C.F.R.

404.1520a.  He found that the evidence supported only mild restrictions of activities of daily

living.  Plaintiff was able to independently and effectively care for her personal needs, prepare

meals, drive a car, perform household chores, and maintain a residence.  He found that Plaintiff

has moderate difficulties in maintaining social functioning, as she got along with family but had

no friends.  ALJ Engelman opined that Plaintiff had mild difficulties in maintaining

concentration, persistence or pace.  Plaintiff reported that she read frequently and had no

difficulty because of concentration.  Further, there was no evidence of deterioration or

decompensation.

ALJ Engelman concluded that Plaintiff had the residual functional capacity (RFC) to

perform a significant range of simple, light work that involves no repetitive use of the hands and

limited contact with the public (R. 28).

Plaintiff was unable to perform her past work and had no transferrable skills.  Although

Plaintiff's limitations precluded her from performing a full range of light work, using the

Medical-vocational tables as a guideline and relying on VE Shaner's testimony regarding

available jobs, ALJ Engelman determined that Plaintiff was not disabled (R. 29).

## II.   ANALYSIS

### A.   Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.    <u>Factual Analysis</u>**

---

[5] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

In his motion for summary judgment Plaintiff argues that ALJ Engelman erred as follows: (1.) discounting Plaintiff's credibility, (2.) asserting Plaintiff did not have any medication side effects (3.) asserting that Plaintiff never identified any specific limitations on her ability to walk, stand, sit, lift, or carry, (4.) incorrectly stating that Plaintiff alleged an inability to work due to fatigue, anxiety, depression and memory problems rather than because of pain in her hands, stomach, shoulder and neck, and memory problems, (5.) incorrectly indicating that Plaintiff's social worker reported Plaintiff had significant improvements in symptoms of depression, statements of general satisfaction in daily living and stabilization at an improved level, and (6.) by forming a deficient hypothetical question.

### 1.    *Plaintiff's Credibility*

Plaintiff claims that the ALJ improperly assessed her credibility and allegations of pain. Subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))" *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, (*Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*,  336 F.3d 469, 476 (6th Cir. 2003), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain.  *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir.

14

1990); *Duncan,* 801 F.2d at 852.  While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence.  Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain.  Section 404.1529(c)(2),11  29 C.F.R. § 404.1529(c)(2) states:

> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

 *See also Duncan,* 801 F.2d at 853; *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

Yet, in determining the existence of substantial evidence, it is not the function of the federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In *Jones* the Court noted that an ALJ can reject a claimant's credibility on pain and other symptoms, and exclude these from the hypothetical question to the VE, if the ALJ's reasons are adequately explained.  *Jones,* 336 F.3d at 476.

In the present case, ALJ Engelman properly took Plaintiff's complaints into account and adequately explained his reasons for discounting her credibility and statements.  ALJ Engelman found that Plaintiff's allegations regarding her limitations were not fully credible because the degree of pain and limitation alleged was not consistent with the objective medical evidence, including the testimony at the hearing and the information she provided on her daily activity

questionnaire.  Specifically, he noted that Plaintiff had not required long-term hospitalization for any physical or mental difficulties and no further surgical intervention or other aggressive treatments had been prescribed.  Indeed, not one physician found Plaintiff was totally disabled or unable to work.  On the contrary, one examining source, albeit for the state agency, Dr. Forrer concluded that Plaintiff could work forty hours a week with adequate pacing and concentration, at a job that was simple, routine and repetitive, and, in fact, she could work at a job at a higher level (R. 174).

Moreover, with respect to activities of daily living, Plaintiff reported routinely caring for her personal needs, preparing meals, shopping for groceries, performing household chores and occasionally driving her car to run errands.  She watched television read regularly and visited her daughter.  Given the absence of objective medical evidence supporting Plaintiff's claims, and the evidence that Plaintiff could manage her personal care needs, was oriented to person, place, and time, and in all other respects is able to function on a daily basis, substantial evidence supports the ALJ's decision to discount Plaintiff's credibility.

Plaintiff's counsel  contends that in determining her credibility, the ALJ incorrectly relied on her disincentive to work based on her receiving about $2,200 in monthly extended disability from her employer.[6]   Yet, courts, including this circuit have held that little incentive to return to work should be considered in assessing a claimant's credibility. *See Mullen v. Bowen*, 800 F.2d

---

[6] In support of Plaintiff's character and desire to work, Plaintiff's council indicated that Plaintiff had previously been awarded and was receiving Social Security Disability benefits from October 1987 through July 1994 and upon returning to work, after overcoming her disabling impairment, she made a substantial amount of money for as long as she physically and emotionally could (R. 54, 55).

535, 547 (6th Cir. 1986); *Flaten v. Secretary of Health and Human Services*, 44 F.3d 1143 (9th

Cir. 1995); *O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir. 2003).  Regardless, this

disincentive to work was but one of many factors the ALJ considered in his entire credibility

analysis (R. 23-25).  The ALJ considered other relevant factors in assessing Plaintiff's

credibility, and therefore, even if ignored, his discussion of Plaintiff's disincentive to work

would not affect the validity of the ALJ's conclusion regarding the credibility of Plaintiff's

complaints of pain and symptoms.

      2.    ***Medication Side Effects***

      Plaintiff asserts the ALJ improperly found that she did not have any medication side

effects.  In particular, Plaintiff argues that evidence in the record directly contradicts ALJ's

Engelman's finding that "[t]he record does not reflect any complaints of significant side

effects or ineffectiveness" (R. 24).   In support of her claim of medication side effects, Plaintiff

relies on her testimony at the hearing, in response to questioning by her attorney, and on a

symptom questionnaire that she completed for the state agency.  At the hearing, Plaintiff testified

that the medicines, which she takes on a daily basis, make her drowsy, sometimes nauseated,

give her headaches and that she lies down after taking the medicines (R. 316).  In addition,

Plaintiff indicated on her symptom questionnaire that the medicine gives her side effects of

"nausea, stomach cramps, headaches" (R. 90).

      Yet, an examination of the medical record reveals that Plaintiff never complained to any

physician of any medication side effects in order to change her medication regimen.  In fact, on

separate occasions, Plaintiff informed Dr. Nutakki she could tolerate the current dosage of her

medication (R. 166), and that "she had been doing fairly well on the current dosage of

medication" (R. 224). Dr. Nutakki also confirmed that Plaintiff was doing well on Prozac and

Serzone (R. 160).[7] Based on the objective evidence of record, the ALJ reasonably found that

Plaintiff had no medication side effects.

### 3.      *Limitations*

Plaintiff argues that ALJ Engelman incorrectly stated that Plaintiff "did not identify any

specific limitations in her ability to walk, stand, sit, lift or carry or any activity that precipitated

or aggravated her symptoms" (R. 24). At the hearing, Plaintiff testified that her lifting is limited

to about a half gallon and that she has to utilize both hands when lifting such an item. Plaintiff

also testified that she has problems pushing, pulling, reaching overhead, holding onto objects and

that she cannot open lids on jars (R. 317). On her symptom questionnaire, Plaintiff indicated

that her pain is mostly constant and that there does not need to be a certain activity that causes

the pain (R. 89).

It would have been preferable for ALJ Engelman to have acknowledged directly

Plaintiff's statements, but on this record as a whole, it cannot be said as a matter of law that ALJ

Engelman had to credit Plaintiff's claims that have so thin a paper record supporting them.

Indeed, ALJ Engelman provided several reasons that he discounted Plaintiff's credibility.

---

[7] Plaintiff argues that the ALJ erred by stating "[h]er medication was switched to Prozac
that could be taken on a weekly basis and easier for her to remember" (Dkt. #8, p. 12).
Plaintiff's point appears to be that she was forgetting to take her medication, so her medication
was supplemented, not "switched", with Prozac, as she continued to also take Serzone on a daily
basis. Yet, the fact remains that Plaintiff was prescribed Prozac because it could be taken
weekly, as opposed to daily, and was thus easier for Plaintiff to remember. Indeed, at the time
Prozac was first prescribed, Plaintiff stated to Dr. Nutakki that it "would be easier for her to
remember" (R. 164). Moreover, Dr. Nutakki reported on a subsequent visit that Plaintiff was
"doing well on the combination of Prozac Weekly and Serzone at night" (R. 160). Therefore, the
ALJ did not error in indicating that Plaintiff was having difficulty remembering to take her
Serzone and was given Prozac Weekly as a remedy.

Accordingly, ALJ Engelman was acting within the scope of his authority that Congress granted to the administrative agency to make factual determinations. There is substantial evidence in the record to uphold ALJ Engelman's determination of concerning Plaintiff's level of limitation.

### 4. *Plaintiff's Alleged Disability*

Plaintiff claims that the ALJ incorrectly found that she alleged an inability to work due to fatigue, anxiety, depression and memory problems (R. 24). Rather, Plaintiff asserts that at the administrative hearing, after being questioned by the ALJ, she stated that she could not work because of pain in her hands, stomach, shoulder, and neck, and her memory problems (R. 314). Regardless of the characterization of Plaintiff's disability, a close reading of the ALJ's decision reveals that the ALJ noted and considered all of Plaintiff's alleged problems, including those associated with stomach pain and ulcers. Specifically, ALJ Engleman acknowledged that Plaintiff alleged problems with stomach pain and ulcers, but he found it was not of a disabling nature and not fully supported by the clinical and diagnostic record (R. 23).

The objective medical evidence in the record also failed to establish the presence of any underlying physical condition that could reasonably be expected to produce Plaintiff's alleged symptoms, and, there was no evidence of any resultant effects caused by any underlying condition that would substantiate Plaintiff's alleged symptoms. Cervical MRI findings showed mild spondyloarthritic changes at C5-6 and diffuse bulge of the annulus (R. 201). Yet, the Sixth Circuit has affirmed findings that claimants with much more significant impairments were not disabled. *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 230-31 (6th Cir. 1990) (affirming finding of not disabled where claimant had a herniated disc and degenerative arthritis in the spine).

19

In addition, February 2003 EMG studies of the upper extremities showed bilateral carpal tunnel syndrome and C5 radiculopathy on the right (R. 196-98). That problem was resolved in November 2003, when plaintiff underwent right carpal tunnel release (Tr. 192)  Significantly, after examining Plaintiff on December 15, 2003, Dr. Levin never found plaintiff unable to work, but simply precluded her from working at her previous job which, according to VE Shaner, required repetitive use of the hands (R. 193, R. 319).   This evidence is not inconsistent with the ALJ's determination that plaintiff could not perform her past relevant work, but could do a limited range of light work (Tr. 25-28). The ALJ determination that plaintiff's physical impairments did not preclude light work that did not involve repetitive use of the hands is supported by substantial evidence.

The ALJ also considered Plaintiff's mental condition and determined that Plaintiff had major depression (R. 23, 28).  Based on the evidence of record that related to Plaintiff's mental condition, the ALJ considered Plaintiff's mental impairment in accordance with the Commissioner's regulations. 20 C.F.R. § 404.1520a (R. 23-24).  He found that evidence supports only mild restrictions of activities of daily living.  Plaintiff was able to care for her personal needs independently and effectively, prepare meals, drive a car, perform household chores, and maintain a residence.  He found that Plaintiff had moderate difficulties in maintaining social functioning, as she gets along with family but has no friends.  ALJ Engelman opined that Plaintiff had only mild difficulties in maintaining concentration, persistence or pace. Plaintiff reported that she read frequently and had no difficulty because of concentration.

Further, there is no evidence of deterioration or decompensation.  Plaintiff was alert and oriented, she had intact thought processes and no thought disorder, her problems with memory

20

varied, at most times she had no concentration problems, her mood was depressed, her affect was flat or blunted, and she had no hallucinations, obsessions, compulsions, suicidal ideations, or homicidal ideations (R. 160, 162, 164-67, 172-74, 215, 219-20, 222-24, 229). Once the severity of the functional limitations because of Plaintiff's mental condition has been determined, there then must be a residual functional capacity assessment. 20 C.F.R. § 404.1520a(d)(3). Based on those functional limitations and the evidence of record, the ALJ determined that Plaintiff could perform simple work that did not require more than limited contact with the public (R. 23-25). There is no legal basis to disturb this finding.

Finally, ALJ Engelman took into consideration Plaintiff's testimony with respect to the severity of her limitations and restrictions, and her symptoms, but ultimately discounted those complaints. As noted above there was an adequate basis for making this credibility finding. Thus, the ALJ gave adequate consideration to all of Plaintiff's symptoms and causes of her alleged disability.

### 5. *Plaintiff's Social Worker's Opinion*

Plaintiff claims that the ALJ incorrectly wrote that Plaintiff's social worker from Hillside Behavioral Services, Ms. Gustafson, reported Plaintiff had significant improvement in symptoms of depression, statements of general satisfaction in daily living and stabilization at an improved level (R. 23, 221). Plaintiff asserts that these were not conclusions by Ms. Gustafson, but related to discharge criteria. While the ALJ never clarified that these statements were discharge criteria, his failure to do so does not warrant a modification of his finding because the ALJ never relied on Ms. Gustafson's report when he determined Plaintiff's limitations due to her mental condition.

Moreover, a social worker is not a medical source under 20 C.F.R. § 404.1513, and, therefore, an ALJ is not required to give such an opinion the weight afforded that of an acceptable medical source within the meaning of 20 C.F.R. § 404.1527(d).[8] 20 C.F.R. § 404.1513(a) lists categories of "acceptable medical sources," and social workers are not included in that list. Instead, a social workers as a therapist is considered one of the "other sources" that may assist the ALJ in determining how a claimant's impairment affects ability to work. 20 C.F.R. § 404.1513(d).

Yet, a social worker's opinion is not granted the same weight as that of a medical doctor, such as Dr. Forrer who performed a psychiatric evaluation of Plaintiff, or a psychologist. An ALJ is not required to giving controlling weight to a social worker's opinion, but must reasonably take such information into account when reaching his decision. In this case, as noted above, although ALJ Engelman found Plaintiff's major depression to be severe, he provided several reasons why he did not conclude it was disabling under the regulations (R. 23-24). Indeed, not one psychologist or psychiatrist found that Plaintiff was unable to work because of her mental condition. Therefore, ALJ Engelman did not error in his treatment of Plaintiff's social worker's opinion. Because ALJ Engelman's determination of Plaintiff's mental condition is supported by substantial evidence, it should not be overturned.

**6.   *Hypothetical Question***

Plaintiff asserts that in determining that she could perform a significant number of jobs, the ALJ relied on a deficient hypothetical question to the VE because it did not include her being

---

[8] 20 C.F.R. § 404.1527(a)(2) states that medical opinions are statements from physicians and psychologists or other acceptable medical sources reflecting judgments about the nature and severity of a claimant's impairments.

fully credible and suffered from several of the alleged errors discussed above.  Contrary to Plaintiff's claim, the hypothetical question the ALJ asked the VE, and the corresponding answer the ALJ relied on, was adequate and proper because it included all of Plaintiff's substantiated impairments and resultant limitations. The ALJ may pose hypothetical questions to the VE which include only those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Therefore, ALJ Engelman's hypothetical question is legally sufficient and should be upheld.

### III.    EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

In her brief, Plaintiff introduces evidence submitted first to the Appeals Council, but does not make an argument for remand based on this "new" evidence.  Where a party presents new evidence on appeal to the Appeals Council that denies review or to the federal court for the first time, the Court can consider the evidence only to determine if a remand is appropriate under sentence six of 42 U.S.C. § 405(g) for further consideration of the evidence but only if the party seeking remand shows that the new evidence is material.  In this case, Plaintiff has not provided this Court with an argument for a sentence six remand.   Nor is it evident that this evidence warrants a remand under sentence six of § 405(g)

This Court need only consider issues that have been fully developed by the briefs or in the record.  Issues that are adverted to in a perfunctory manner without some effort to develop an argument related to them are generally deemed waived.  *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir.2002).  Further, "[i]t is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . .  put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997).  Therefore, there is no basis for this

court to order a remand based on this evidence first presented to the Appeals Council.


**IV.    RECOMMENDATION**

For the reasons stated above, It Is Recommended that Plaintiff's motion for summary

judgment be **DENIED** and the Commissioner's motion for summary judgement **GRANTED.**  The

parties to this action may object to and seek review of this Report and Recommendation, but are

required to file any objections within ten (10) days of service of a copy hereof as provided for in

28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985);

Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir. 1991); United States v.

Walters, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to

raise others with specificity, will not preserve all the objections a party might have to this Report

and Recommendation.  Willis v. Sec'y of Health and Human Servs., 931 F.2d 390, 401 (6th Cir.

1991); Smith v. Detroit Fed'n of Teachers Local, 231, 829 F.2d 1370,1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20) pages in

length unless by motion and order such page limit is extended by the Court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.


Dated: January 31, 2007                                       s/Steven D. Pepe                                
Ann Arbor, Michigan                                          United States Magistrate Judge

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on <u>January 31, 2007</u>, I electronically filed the foregoing paper with the Clerk  Court using the ECF system which will send electronic notification to the following: <u>Janet L. Parker, Mikel E. Lupisella</u>,  and I hereby certify that I have mailed United States Postal Service the paper to the following non-ECF participants: <u>Social Security Administration, Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>

<u>s/ James P. Peltier</u>
James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850
pete_peltier@mied.uscourts.gov

25